GREGORY E. GARMAN
Nevada Bar No. 6654
ggarmanGRE@gtg.legal
WILLIAM M. NOALL
Nevada Bar No. 3549
wnoall@gtg.legal
GARMAN TURNER GORDON L.L.P.
7251 Amigo Street,
Suite 210
Las Vegas, NV 89119
Telephone: (725) 777-3000

*Attorneys for AlixPartners, LLP,*
*A.P. Services, LLC*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>BAKKEN RESOURCES, INC.,<br><br>Debtor. | CASE NO. BK-18-17254-btb<br>Chapter 11 |
| ALLAN HOLMS an individual, BAKKEN RESOURCES, INC., a Nevada Corporation,<br><br>Counterclaimants,<br><br>v.<br><br>ALIXPARTNERS, LLP, a Delaware Limited Liability Partnership; A.P. Services, LLC, a Delaware Limited Liability Company,<br><br>Counterdefendants. | Adversary Case No.<br><br><br><br><br><br><br><br><br>Date: N/A<br>Time: N/A |

## NOTICE OF REMOVAL

To:     THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, ALL PARTIES IN THE ABOVE-CAPTIONED STATE COURT CIVIL ACTION HEREBY REMOVED, THE CLERK OF THE SECOND JUDICIAL DISTRICT COURT, IN AND FOR WASHOE COUNTY, NEVADA, AND THE CLERK OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA.

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 157, 1334, and 1452(a), Rules 9011 and 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 1001(b) and 9027(a) of the Local Rules of Bankruptcy Practice , that AlixPartners, LLP ("Alix") and A.P. Services, LLC (collectively with Alix, the "Removing Parties"), hereby remove to the United States Bankruptcy Court in the District of Nevada ("Court") only those claims, causes of action, and counterclaims ("Claims") against the Removing Parties, which, among other things, directly relate to and expressly seek to undermine the orders and authority of the United States Bankruptcy Court, District of Nevada in Case No.: BK-18-17254-btb, as set forth in the action described below filed in the Second Judicial District Court for the County of Washoe, Nevada:

**Statement of Facts**

1.      On February 21, 2020, the Removing Parties received summons and a copy of the initial pleading in an action in the Second Judicial District Court for the County of Washoe, Nevada entitled *Allan Holms v. Dan Anderson, et al.* (Case No.: CV14-00544) (the "Nevada Action"), adding the Removing Parties as counterdefendants in the pending Nevada Action.

2.      On December 7, 2018 (the "Petition Date"), Bakken Resources, Inc. ("BRI" or the "Company") filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Code") in the Court (ECF. 1).[1]

3.      On December 7, 2018, contemporaneous with the filing of the voluntary petition, BRI filed *Debtor's Motion For Entry Of An Order Authorizing The Debtors To (A) Continue To Operate Their Cash Management System (B) Honor Certain Prepetition Obligations Related Thereto, (C) Retain Prepetition Bank Accounts (D) Maintain Existing Business Forms, (E) Granting A Waiver Of Compliance With Section 345 Of The Bankruptcy Code And (F) Related Relief* (the "First Day Motion") (ECF. 7).  The First Day Motion sought an order to ensure that the debtor could continue to operate as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The First Day Motion included the *Declaration of Richard Robbins in Support of Bankruptcy Filing and First Day Motions* (the "First Day Declaration") filed contemporaneously therewith as Exhibit C.

[1] "ECF." refers to docket number entry for the Court's electronic filing system and will be used to refer to filings submitted in the Nevada Bankruptcy Court, Case No.: BK-18-17254-btb.

4.      On December 18, 2018, the Court granted the First Day Motion (ECF. 87).  In the Court's order, the Court found that it had jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334 (ECF. 87 at 2).  The Court further found that the proceeding was a core proceeding pursuant to 28 U.S.C. § 152(b)(2) and that venue of the proceeding was proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      On January 18, 2019, Allan Holms filed his Motion to Dismiss (ECF. 145).

6.      On January 22, 2019, James M. Holms, Personal Representative of the Estate of Val M. Holms, filed his Joinder to Motion to Dismiss (ECF. 157).

7.      On January 30, 2019, James M. Holms, Personal Representative of the Estate of Val M. Holms, as managing member of Holms Energy, LLC, filed a Joinder to Motion to Dismiss (ECF. 168).

8.      On February 4, 2019, Manuel Graiwer filed his Joinder to the Motion to Dismiss (ECF. 197).

9.      On February 4, 2019, Debtor filed its Objection to the Motion to Dismiss (ECF. 200).

10.     On February 11, 2019, Allan Holms filed his Reply to Debtor's Objection to the Motion to Dismiss (ECF. 212).

11.     On February 13, 2019, Debtor filed its Notice of Limited Consent to Dismissal and Withdrawal of Declaration in Support of the Objection to Motion to Dismiss (ECF. 220).

12.     A hearing on the Motion to Dismiss was held on February 15, 2019, and it was continued until March 8, 2019, because the parties, through counsel, had met and determined that they could resolve the Motion to Dismiss by way of a stipulation.

13.     On March 5, 2019, a *Stipulation for Dismissal of Bankruptcy Case* (ECF. 245) (the "Stipulation"), was filed by and between Allan G. Holms, by and through his counsel, Robison, Sharp, Sullivan & Brust and Law Offices of Amy N. Tirre, APC; BRI, by and through its counsel Brownstein Hyatt Farber Schreck, LLP and Lowenstein Sandler LLP; James M. Holms, Personal Representative of the Estate of Val M. Holms and managing member of Holms Energy, LLC, by and through his counsel Cecilia Lee, Esq. and Elizabeth High, Eq., of Lee High, Ltd.; and Manuel Graiwer, by and through his counsel Woodburn and Wedge.  The Stipulation provided that David Hindman and

Richard Robbins of Alix, would resign from their temporary posts as Chief Restructuring Officer and VP of Restructuring prior to the entry of a Dismissal Order and that they would receive payment for professional services rendered, subject to capped amounts specified in the Stipulation.

14.     On March 14, 2019, this Court executed the Dismissal Order and ordered, among other things, that "[t]he Stipulation attached [t]hereto as Exhibit 1 [wa]s APPROVED as binding on and among the parties to the Stipulation (ECF. 253).

15.     On February 21, 2020, Allan Holms and BRI filed a Second Amended Counterclaim in the Nevada Action naming newly-joined Counterdefendants: Lowenstein Sandler, LLP, AlixPartners, LLP, A.P. Services, LLC, Feltman Ewing, P.S., Brownstein Hyatt Farber Schreck, LLP, Wesley J. Paul, and Paul Law Group, LLP.  Among other relief sought from the Nevada state court, the Nevada Action seeks a declaration that the prior board breached this Court's orders in failing to abide by the Stipulation.  The Nevada Action further seeks to excuse Allan Holms from performing any obligation under the Stipulation, *see* Nevada Action ¶¶ 190-92, despite this Court's orders that the Stipulation is "binding on and among the parties" (*see* ECF. 253).  Further, the Nevada Action seeks the state court to declare that monies paid to the newly-joined Counterdefendants including but not limited to compensation of officers and administrative expenses, *see* 11 U.S.C. §§ 330, 503, and monies ordered by this Court to be paid, subject to capped amounts specified in the Stipulation, has resulted in "irreparable harm and substantial damage to BRI and its shareholders in Nevada."  Nevada Action ¶ 16.  The relief sought in the Nevada Action concerns the very issues that were resolved pursuant to this Court's orders.  In short, the Nevada Action seeks to reverse this Court's orders via state action.

16.     The Nevada Action is not a proceeding before the United States Tax Court.

17.     The Nevada Action is not a civil action by a governmental unit to enforce its police or regulatory power.

18.     The Nevada Action, until the filing of this Notice of Removal and the filing of a copy of this Notice of Removal with the State Court, was pending in the Second Judicial District Court of the State of Nevada, County of Washoe.

**Basis for Removal: This Court Has Original and Exclusive Jurisdiction Over the Claims**

19.    The Claims in the Nevada are removed to this Court pursuant to 28 U.S.C.§ 1452(a) which states: "[a] party may remove any claim or cause of action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Section 1334 states: "the district courts shall have original and exclusive jurisdiction over all cases under title 11" and shall have "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b). Nevada Local Rule of Bankruptcy Practice LR 1001(b)(1), states: "[a]ll cases … related to a case under title 11 are referred to the bankruptcy court for this district."

20.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Claims against the Removing Parties constitute a core proceeding pursuant to 28 U.S.C. § 157(b) because the genesis of those particular claims was the bankruptcy proceeding. *See In re Lowenbraun*, 453 F.3d 314, 320-21 (6th Cir. 2006) (holding that "state-law action was a core proceeding" because the "claims would not exist but for the bankruptcy proceeding" because "the genesis of [the] state-law action was the bankruptcy proceeding"); *In re CBI Holding Co., Inc.*, 529 F.3d 432, 461 (2d Cir. 2008) (affirming district court's conclusion that when state law "claims of negligence, breach of contract, and fraud are based upon the same operative facts" as "core proceedings" then "those claims are also core").

21.    This Court has "arising under" jurisdiction over the Claims in the Nevada Action under 1334(b). "[T]he phrase 'arising under title 11'" . . . describe[s] those proceedings that involve a cause of action created or *determined by* a statutory provision of title 11." *In re Harris*, 590 F.3d 730, 737 (9th Cir. 2009) (emphasis added). Here, the Claims against the Removing Parties are wholly determined by statutory provision(s) of title 11, including, but not limited to, Sections 105, 363 and 1107 of the Bankruptcy Code.

[Section 105(a) provides that] "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [] title [11]. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

255486301

11 U.S.C. § 105(a).

[Section 363(b), (c) provide in relevant part that] "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." and that "if the business of the debtor is authorized to be operated under section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363.

[Section 1107 provides that] "a debtor in possession shall have all the rights . . . and powers and shall perform all the functions and duties . . . of a trustee serving in a case under . . . chapter 11." 11 U.S.C. § 1107.

As could a trustee, a debtor in possession can use, sell, or lease property of the estate and otherwise enter into transactions, particularly when, as here, the Court issued interim orders pursuant to Section 105(a) of the Code providing for the same, *see, e.g.*, ECFs. 87, 89, 90, and 100 (approving request for relief pursuant to statutory predicates/sections 105, 345, 363, 1107, and 1108 of the Code). Thus, the Removing Parties acted pursuant to statutory provisions of the Code and interim orders of the Court, solely in the context of a bankruptcy proceeding, by a debtor in possession who stood in the shoes of or at least had the same powers as trustee pursuant to Section 1107. The Claims are determined by these statutory provisions because the abovementioned sections of the Code completely determine whether the Removing Parties acted properly. Thus, the Court has "arising under" jurisdiction over the core proceedings involving the Claims.

22.     Further, the Court has exclusive jurisdiction pursuant to Section 1334(a) of the Claims because "[t]he district courts shall have original and exclusive jurisdiction of all cases under title 11." The Case was commenced pursuant to title 11, and all facts related to the Claims being removed are wholly under title 11 and involve this Court's orders regarding the same. As such, the Court has exclusive jurisdiction over the Claims.

23.     The Court has "arising in" jurisdiction over the Nevada Action pursuant to 28 U.S.C. § 1334(b) because the Claims against the Removing Parties / professionals raised in the Nevada Action are the very type of administrative matters that would not exist but for the bankruptcy proceeding. *In re Williams*, 256 B.R. 885, 891 (B.A.P. 8th Cir. 2001) ("The phrase 'arising in' generally refers to

administrative matters that, although not expressly created by title 11, would have no existence but for the fact that a bankruptcy case was filed."); *In re Smith-Canfield*, No. ADV 09-6327-FRA, 2011 WL 1883833, at *3 (Bankr. D. Or. May 17, 2011) ("[T]he *sine qua non* of 'arising in' jurisdiction is whether the cause of action would have no existence outside of a bankruptcy case, not whether another forum could entertain it.") (citing *Harris v. Whitman (In re Harris)*, 590 F.3d 730, 737 (9th Cir. 2010) (affirming dismissal of state-court action by bankruptcy court after removal where claims alleged that trustee and her agents breached a settlement agreement that was entered into during the course of the bankruptcy proceedings))).

24.    This Court also has "related to" jurisdiction over the Nevada Action pursuant to 28 U.S.C. § 1334(b).  The removed Claims are "related to" bankruptcy because they affect the outcome of the bankruptcy proceeding, the handling and administration of the estate in that proceeding, and this Court's orders regarding the same.  Concurrently herewith, the Removing Parties will file a motion to reopen the bankruptcy proceeding.

**Consent and Timeliness[2]**

25.    The Removing Parties consent to the entry of final orders and judgments by the bankruptcy Court with respect to all Claims and causes of action removed to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. See Local Rule 9027 (a).

26.    Although the Claims against the Removing Parties are the only claims that the Removing Parties seek to remove, and those Claims have only been asserted in the most recent claims filed in the February 21, 2020 Second Amended Counterclaim, out of an abundance of caution, the Removing Parties are transmitting copies of all pleadings on file in the Nevada Action, which are being provided in a separate Appendix (due to volume) which will be filed separately hereafter.[3]

---

[2] Counterclaimants in the Nevada Action have agreed that a response to their suit will not be due until April 20, 2020.  The Removing Parties believe that the Claims in the lawsuit are baseless and will be easily dispensed by this Court.
[3] The Removing Parties attach **Exhibit A**, the Second Amended Countercomplaint filed in the Second Judicial District Court for the County of Washoe, Nevada, for the Court's reference.  This is the only pleading that is subject to this removal because it the only pleading stating claims against the Removing Parties.  In an abundance of caution, the Removing Parties

7

27.     The Removing Parties have filed this Notice of Removal within thirty days of service. Thus, removal is timely under Rule 9027(a)(3) of the Federal Rules of Bankruptcy Procedure.

**Service on Parties in Nevada Action and Filing of Notice with State Court**

28.     Promptly after filing the Notice of Removal, the Removing Parties will serve a copy of it on all parties to the Nevada Action as required by Federal Rule of Bankruptcy Procedure 9027(b).

29.     Promptly after filing the Notice of Removal, the Removing Parties will file with the State Court a copy of this Notice of Removal, as required by Federal Rule of Bankruptcy Procedure 9027(c).

DATED this 23rd day of March, 2020.

GARMAN TURNER GORDON L.L.P.

By:     /s/ William M. Noall                              .
        William M. Noall
        wnoall@gtg.legal
        7251 Amigo Street,
        Suite 210
        Las Vegas, NV 89119
        Telephone: (725) 777-3000

AND

SIDLEY AUSTIN L.L.P.

        Yvette Ostolaza
        (*pro hac vice forthcoming*)
        2021 McKinney Avenue
        Suite 2000
        Dallas, Texas 75201
        (214) 981-3300
        yvette.ostolaza@sidley.com

        Robert S. Velevis
        (*pro hac vice forthcoming*)
        2021 McKinney Avenue
        Suite 2000

will file with the Court within 14 days all pleadings and papers on file with the Nevada State. Given the current Covid-19 situation it is not practicable to obtain and file all papers contemporaneously.

255486301

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dallas, Texas 75201
(214) 981-3300
rvelevis@sidley.com

*Attorneys for AlixPartners, LLP,*
*A.P. Services, LLC*

# EXHIBIT A

# EXHIBIT A

 **CT Corporation**

**Service of Process Transmittal**
02/21/2020
CT Log Number 537240644

TO:     Kathy Koorenny
AlixPartners, LLP
2000 Town Ctr Ste 2400
Southfield, MI 48075-1250

RE:     **Process Served in Delaware**

FOR:     AlixPartners, LLP  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ALLAN HOLMS, etc. and BAKKEN RESOURCES, INC., etc., Counterclaimants vs. DAN ANDERSON, etc., et al., Counterdfts. // To: ALIXPARTNERS, LLP, etc. |
| **DOCUMENT(S) SERVED:** | Summons, Amended Counterclaim, Certificate, Attachment(s) |
| **COURT/AGENCY:** | Washoe County Second Judicial District Court, NV Case # CV1400544 |
| **NATURE OF ACTION:** | BRIs claim for breach of fiduciary duty (See document for additional information) |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/21/2020 at 12:44 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days after service of this summons, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | FRANK C. GILMORE ROBISON, SHARP, SULLIVAN & BRUST 71 Washington Street Reno, NV 89503 775-329-3151 |
| **REMARKS:** | Please note documents contain additional case numbers: CV1700360 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 02/21/2020, Expected Purge Date: 02/26/2020 |
| | Image SOP |
| | Email Notification,  Kathy Koorenny  kkoorenny@alixpartners.com |
| | Email Notification,  Kaitlyn Sundt  ksundt@alixpartners.com |
| | Email Notification,  Brian Kelly  bkelly@alixpartners.com |
| | Email Notification,  BOBBIE JUSTICE  rjustice@alixpartners.com |
| | Email Notification,  Kaitlyn Sundt  ksundt@alixpartners.com |
| | Email Notification,  Nicholas Andrew  nandrew@alixpartners.com |
| **SIGNED:** | The Corporation Trust Company |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 **CT Corporation**

**Service of Process Transmittal**
02/21/2020
CT Log Number 537240644

**TO:**      Kathy Koorenny
          AlixPartners, LLP
          2000 Town Ctr Ste 2400
          Southfield, MI 48075-1250

**RE:**      **Process Served in Delaware**

**FOR:**     AlixPartners, LLP  (Domestic State: DE)

**ADDRESS:**              208 S La Salle St Ste 814
                      Chicago, IL 60604-1101

**For Questions:**        866-203-1500
                      DealTeam@wolterskluwer.com

Page 2 of  2 / MS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



# PROCESS SERVER DELIVERY DETAILS

**Date:**               Fri, Feb 21, 2020

**Server Name:**        Kevin Dunn

**Location:**           Wilmington, DE

| Entity Served | ALIXPARTNERS, LLP |
|---|---|
| Agent Name | THE CORPORATION TRUST COMPANY |
| Case Number | CV14-00544 |
| Jurisdiction | DE |



1  Code:  4085

2          IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

3                  IN AND FOR THE COUNTY OF WASHOE

4  ALLAN HOLMS an individual, BAKKEN
   RESOURCES, INC., a Nevada Corporation,

5          Counterclaimants,                    Case. No. CV14-00544

6          vs.                                  Dept. No.  B15
   ALIXPARTNERS, LLP, a Delaware Limited
   Liability Partnership; et al.          ,     (Consolidated with Case No.
7                                               CV17-00360)

8          Counterdefendants.
   _____/

9                                               ALIXPARTNERS, LLP, a Delaware
                                                Limited Liability Partnership
10                          SUMMONS

11      **TO THE DEFENDANT:  YOU HAVE BEEN SUED.   THE COURT MAY DECIDE
   AGAINST  YOU  WITHOUT  YOUR  BEING  HEARD  UNLESS  YOU  <u>RESPOND IN</u>
12  <u>WRITING</u>  WITHIN  21  DAYS.     READ  THE  INFORMATION  BELOW  VERY
   CAREFULLY.**

13      A civil complaint or petition has been filed by the plaintiff(s) against you for the relief as set
14  forth in that document (see complaint or petition).   When service is by publication, add a brief
   statement of the object of the action.
15  The object of this action is: <u>Breach of Fiduciary Duty/Breach of Contract/Negligence/Declaratory Relief</u>   .

16      1.  If you intend to defend this lawsuit, you must do the following within 21 days after service
            of this summons, exclusive of the day of service:
17          a.  File with the Clerk of the Court, whose address is shown below, **a formal written
18              answer** to the complaint or petition, along with the appropriate filing fees, in
                accordance with the rules of the Court, and;
19          b.  Serve a copy of your answer upon the attorney or plaintiff(s) whose name and address
                is shown below.
20      2.  Unless you respond, a default will be entered upon application of the plaintiff(s) and this
21          Court may enter a judgment against you for the relief demanded in the complaint or
            petition.
22                                          FEB 1 8 2020
       Dated this _____ day of _____, 20 20   .

23
   Issued on behalf of Plaintiff(s):            JACQUELINE BRYANT
24                                              CLERK OF THE COURT
       Frank C. Gilmore, Esq./Hannah Winston, Esq.   By: _____R. Rodriguez_____
   Name: _ROBISON, SHARP, SULLIVAN & BRUST_
25                                                   Deputy Clerk
   Address: 71 Washington Street                 Second Judicial District Court
26          Reno, Nevada 89503                    75 Court Street
   Phone Number: 775-329-3151                     Reno, Nevada 89501
27          Email:  fgilmore@rssblaw.com
   Email: _Email: hwinston@rssblaw.com_

28

                                               1

REV 2/2019 JDB                                                              SUMMONS

F I L E D
Electronically
CV14-00544
2020-02-18 10:37:14 AM
Jacqueline Bryant
Clerk of the Court
Transaction # 7744029

1    **1490**
Frank C. Gilmore, Esq.

2    Nevada Bar No. 10052
Email: fgilmore@rssblaw.com

3    Hannah E. Winston, Esq.
Nevada Bar No. 14520

4    Email: hwinston@rssblaw.com
ROBISON, SHARP, SULLIVAN & BRUST

5    71 Washington Street
Reno, Nevada 89503

6    Tel: (775) 329-3151
Fax: (775) 329-7941

7

8    Attorneys for BAKKEN RESOURCES, INC. and
ALLAN G. HOLMS

9          IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

10                IN AND FOR THE COUNTY OF WASHOE

11

12    ALLAN HOLMS an individual, BAKKEN          Case No.: CV14-00544
      RESOURCES, INC., a Nevada Corporation,
13                                               Dept. No.: B15
                              Counterclaimants
14                                               (Consolidated with Case No.CV17-00360)

15    v.

16    DAN ANDERSON, an individual, KAREN
      MIDTLYNG, an individual, HERMAN R.
17    LANDEIS, an individual, BILL M. BABER, an
      individual, SOLANGE CHARAS, an individual,
18    DOUGLAS L. WILLIAMS, an individual;
      LOWENSTEIN SANDLER, LLP, a New Jersey
19    Limited Liability Partnership;
      ALIXPARTNERS, LLP, a Delaware Limited
20    Liability Partnership; A.P. SERVICES, LLC, a
      Delaware limited liability company; FELTMAN
21    EWING, P.S. a Washington Professional
      Services Corporation; BROWNSTEIN HYATT
22    FARBER SCHRECK, LLP, a Colorado Limited
      Liability Partnership; WESLEY J. PAUL, an
23    individual; PAUL LAW GROUP, LLP, a New
      York Limited Liability Partnership;

24                              Counterdefendants.
                                                    /
25

26    **ALLAN G HOLMS' AND BAKKEN RESOURCES, INC.'S SECOND AMENDED**
                              **COUNTERCLAIM**
27

28         ALLAN G. HOLMS and BAKKEN RESOURCES, INC., ("BRI"), hereby bring their

1    Second Amended Counterclaim pursuant to Nev. R. Civ. P. 13(h), 15(c) and 20(a)(1), and do

2    complain of Counterdefendants, and each of them, as follows:

3                              PARTIES AND JURISDICTION

4        1.      Counterclaimant Allan G. Holms ("Holms") is an individual residing in Spokane,

5    Washington.

6        2.      Counterclaimant Bakken Resources, Inc. ("BRI"), was at all times relevant to this

7    action, a Nevada Corporation, with its principal place of business in Spokane, Washington.

8        3.      Counterdefendant Dan Anderson is BRI's former Chief Financial Officer, Chief

9    Executive Officer, and a former member of the BRI Board of Directors. Anderson was appointed

10   to the Board on November 23, 2015, and resigned effective April 12, 2019.

11       4.      Counterdefendant Karen Midtlyng is BRI's former Secretary and a former member

12   of the BRI Board of Directors. Midtlyng was appointed to the Board in December 2010, and

13   resigned from the Board effective March 14, 2019.

14       5.      Counterdefendant Herman R. Landeis is a former member of the BRI Board of

15   Directors. Landeis was appointed to the Board on January 4, 2011, and resigned from the Board

16   effective March 14, 2019.

17       6.      Counterdefendant Bill M. Baber is a former member of the BRI Board of Directors.

18   Baber was appointed to the Board on December 19, 2011, and resigned from the Board effective

19   April 12, 2019.

20       7.      Counterdefendant Solange Charas is a former member of the BRI Board of

21   Directors. Charas was appointed to the Board on November 11, 2015, and resigned from the

22   Board effective March 14, 2019.

23       8.      Counterdefendant Douglas L. Williams is a former member of the BRI Board of

24   Directors. Williams was appointed to the Board on November 23, 2015, and resigned from the

25   Board effective March 14, 2019.

26       9.      Each of the former BRI Board of Directors as set forth above will be collectively

27   referred to herein as the "BRI Board."

28       10.     Counterdefendant LOWENSTEIN SANDLER, LLP ("Lowenstein"), is a New

Jersey Limited Liability Partnership that maintained an attorney-client relationship with BRI and represented BRI as counsel-of-record in the BRI Voluntary Petition for Bankruptcy pursuant to Chapter 11 of the United States Bankruptcy Code, filed in the United States Bankruptcy Court, District of Nevada, on December 7, 2018 (hereinafter the "Bankruptcy"). Lowenstein attorneys Jeffrey L. Cohen and Gabriel L. Oliviera appeared *pro hac vice* in the Bankruptcy as counsel for BRI, and were responsible, along with other attorneys at Lowenstein, for giving legal advice and counsel to BRI relative to the Bankruptcy and related legal strategy. BRI paid Lowenstein a considerable fee during the course of its representation of BRI.

11.    Counterdefendant BROWNSTEIN HYATT FARBER SCHRECK, LLP ("Brownstein"), is believed to be a Colorado Limited Liability Partnership. Brownstein maintains an office in Las Vegas, Nevada. Brownstein maintained an attorney-client relationship with BRI and represented BRI as counsel-of-record in the Bankruptcy. Samuel Schwartz, an attorney in the Brownstein firm, appeared as Bankruptcy counsel for BRI, and was responsible, along with attorneys at Lowenstein, for giving legal advice and counsel to BRI relative to the Bankruptcy and related legal strategy. Schwartz filed his Declaration of Attorney in the Bankruptcy, as counsel for BRI, on December 7, 2018, affirming that he "informed [BRI] that [BRI] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter" to BRI. BRI paid Brownstein a considerable fee during the course of its representation of BRI.

12.    Counterdefendant ALIXPARTNERS, LLP, is a Delaware Limited Liability Partnership and an affiliate of Counterdefendant A.P. SERVICES, LLC, a Delaware limited liability company. ALIXPARTNERS, LLP and A.P. SERVICES, LLC (collectively, "Alix") provided consulting services to BRI in Nevada and other states. David Hindman ("Hindman"), an Alix principal, is BRI's former Chief Restructuring Officer. Richard Robbins ("Robbins"), an Alix principal, is BRI's former Vice President of Restructuring.

13.    FELTMAN EWING, P.S. ("Feltman") is a Washington Professional Services Corporation with its primary place of business in Spokane, Washington. Feltman maintained an attorney-client relationship with BRI from 2012 until approximately September 7, 2018. Among

1    other things, Feltman represented BRI as counsel-of-record in this litigation styled *Bakken*

2    *Resources, Inc. v. Allan Holms et al.*, CV17-00360, which was consolidated into the recently

3    dismissed cases styled *Graiwer v. Holms et al., CV14-00544* and *Val Holms v. Bakken Resources,*

4    *Inc, et al.*, CV16-01086 (the 2014 and 2016 actions are collectively referred to as the " BRI

5    Derivative Actions"), in the Second Judicial District Court of the State of Nevada.  Robert F.

6    Greer, an attorney at Feltman, appeared *pro hac vice* on behalf of Defendant Val Holms on July

7    21, 2014, and was counsel of record for BRI in this action and the BRI Derivative Actions from

8    2014 until substituted out on September 7, 2018.  Greer attended hearings in Nevada and attended

9    depositions in this action as counsel for BRI and the BRI Board for which he received a

10   substantial fee. *See* Court Minutes filed in this action on July 3, 2018, and August 20, 2018.

11        14.    Counterdefendant Wesley J. Paul ("Paul") is the former BRI General Counsel, and

12   is a licensed attorney affiliated with the New York law firm Counterdefendant Paul Law Group,

13   LLP, a New York limited liability partnership with its primary place of business believed to be in

14   New York, New York.  Paul represented BRI and the BRI Board from approximately December

15   2011 until the Summer of 2018.  Paul participated in this action as General Counsel for BRI

16   without making an appearance, and attended depositions on behalf of BRI.  Paul received a

17   substantial fee during his course of representation of BRI.

18                                    **JURISDICTION**

19        15.    This action arose after BRI filed a Verified Complaint and Application for

20   Temporary Restraining Order against Allan Holms on February 21, 2017.  BRI sought declaratory

21   and injunctive relief against Holms, seeking to have the Court declare Val Holms' transfer of his

22   BRI stock to Allan Holms void.  This action was consolidated into the BRI Derivative Actions.

23   Allan Holms counterclaimed derivatively on behalf of the BRI stockholders, alleging claims for

24   breach of fiduciary duty, and interference with contractual relations.  In October 2018, the Court

25   dismissed BRI's claims when it granted Allan Holms' Motion for Summary Judgment.  Allan

26   Holms' counterclaims remain pending and are amended by way of this Second Amended

27   Counterclaim.

28        16.    This Court has jurisdiction over each and every newly-named Counterdefendant

1    because each of them represented BRI in Nevada and provided legal and consulting services in

2    Nevada on BRI's behalf. Each and every Counterdefendant entered the State of Nevada, and/or

3    made their appearance in a court or legal action in Nevada for the purpose of offering services

4    within the State of Nevada in exchange for a fee. Each and every Counterdefendant did

5    purposefully avail themselves of the laws and protections of the State of Nevada and did benefit

6    monetarily from their association with BRI in Nevada. The harm alleged herein caused by each

7    and every Counterdefendant resulted in irreparable harm and substantial damage to BRI and its

8    shareholders in Nevada.

9        17.    This Counterclaim was initially brought derivatively by shareholder Allan Holms,

10    pursuant to NRCP 23.1, wherein BRI was named as a Nominal Defendant. On May 8, 2019, the

11    parties stipulated to dismiss BRI as a Nominal Defendant in this action. BRI now joins this

12    Counterclaim pursuant to Rules 13(h) and 20(a)(1) of the Nevada Rules of Civil Procedure,

13    because Counterclaimant Allan Holms and BRI both assert claims for relief jointly, severally, and

14    arising out of the same transaction, occurrence, or series of transactions or occurrences currently

15    pending in this action pursuant to Allan Holms' Counterclaim of January 25, 2018, and

16    subsequent amendments.

17        18.    The newly-joined Counterdefendants LOWENSTEIN SANDLER, LLP,

18    ALIXPARTNERS, LLP, FELTMAN EWING, P.S., BROWNSTEIN HYATT FARBER

19    SCHRECK, LLP, WESLEY J. PAUL, and PAUL LAW GROUP, LLP, are brought into this

20    action as Counterdefendants pursuant to Rule 20(a)(2) of the Nevada Rules of Civil Procedure

21    because the causes of action previously alleged against the BRI Board, as Counterdefendants, arise

22    from the same transaction, occurrence, or series of transactions or occurrences which gave rise to

23    this amended Counterclaim, and the right to relief is asserted against them jointly and severally by

24    Counterclaimants BRI and Allan Holms.

25        19.    Further, this amendment to the Counterclaim is made pursuant to Rule 15(c) of the

26    Nevada Rules of Civil Procedure and must be related back to the date of the original Counterclaim

27    because this amendment asserts claims that arose out of the conduct, transaction, or occurrence set

28    out in the original Counterclaim. Further, for those claims which arose after the amended

Counterclaim was filed on February 14, 2018, Rule 15(d) of the Nevada Rules of Civil Procedure permits Counterclaimants to set out in this amendment, by way of supplement, any transaction, occurrence, or event that happened after the date of the original pleading.

20.     Since the time in which the Counterclaims were initially pled, the constitution of the BRI Board has changed, such that none of the prior members of the BRI Board continue to serve in that capacity.  The present Board of Directors has agreed that BRI should directly pursue the Counterclaims originally brought derivatively by Allan Holms.  Accordingly, the Board of Directors has substituted in place of Allan Holms as the proper real party in interest to pursue direct claims against each of the BRI Board and the newly-named Counterdefendant professionals, as set forth in detail below.

21.     Counterclaimant Holms also asserts direct claims against various Counterdefendants as set forth in detail below.

22.     This Counterclaim asserts causes of action for breach of contract, breach of fiduciary duty, negligence in the form of legal and professional malpractice, declaratory relief, and injunctive relief.  Counterclaimants damages well exceed ten-million dollars ($10,000,000).

**FACTUAL BACKGROUND OF THIS DISPUTE**

23.     Allan Holms' now-deceased brother Val Holms was the former president and CEO of BRI, former Chairman of the BRI Board, and the former single largest BRI shareholder holding approximately 47% of the outstanding stock.  Val Holms contributed to BRI its primary asset, an overriding royalty interest in McKenzie County, North Dakota mineral interests.  The royalties are BRI's only current material income stream.

24.     Including the pending case, there are three other BRI litigation cases which have some bearing on the instant dispute.  The three cases can be summarized as follows:

1.     The "2014 Derivative Action": In 2014, Manuel Graiwer and T. J Jesky, Bakken shareholders, filed a derivative action against Val Holms (then a member of the BRI Board) and other Bakken directors in the Second Judicial District Court of the State of Nevada.  Graiwer alleged that Val Holms and the existing Board had approved a contract with one of Val Holms' entities that amounted to self-dealing.  The 2014 Derivative Action was dismissed with prejudice on August 21, 2019.

2.     The "2016 Derivative Action": In May 2016, Val Holms filed a

Complaint against BRI, BRI General Counsel and the BRI Board contending, among other things, that the Board had entered into a financing transaction which was designed as a scheme to wrest control of BRI from its shareholders. Val Holms alleged that the transaction was fraudulent. Val Holms' claims were dismissed without prejudice on October 16, 2019.

3.    The "Montana Action": In July 2016, BRI filed a Complaint and Application for Temporary Restraining Order and Injunctive Relief in the Montana First Judicial District Court, Cause No. CDV 2016-612, seeking damages and injunctive relief against Val Holms, Allan Holms, and two others. The Montana Action arises from the same core set of facts originally raised by Bakken in the instant action, namely BRI Board and BRI General Counsel's efforts to prevent the shareholders from having any control over the corporation.

**A.    Wesley Paul, Acting as General Counsel, Concocts The Eagle Equity Transaction Scheme in Violation of His Fiduciary Duties to BRI.**

25.    In November 2015, Graiwer, as the plaintiff of the 2014 Derivative Action (the "Derivative Plaintiffs"), and Val Holms appeared before retired federal judge William F. Downes, to settle the 2014 Derivative Action. The settlement efforts resulted in a preliminary settlement subject to BRI Board approval because it involved the tender offer to all shareholders except Val Holms and the Derivative Defendants.

26.    The BRI Board rejected the proposed settlement and in response, filed the Montana Action seeking to block the settlement because it would have given Val Holms control of BRI.

27.    In January 2016, the Derivative Plaintiffs and Val Holms again participated in a settlement conference with Judge Downes, which was unsuccessful.

28.    On or about February 9, 2016, in an effort to prevent a BRI shareholder vote and/or settlement that would cause the replacement of the majority of the BRI Board, Paul, acting as General Counsel to BRI, prevailed upon the BRI Board to amend the BRI Bylaws: (1) by adding language to §3.2 that approved staggering the BRI Board so that only a limited number of board members could be removed by shareholder vote in a given year and, more importantly, (2) by removing the shareholders right to "adopt, amend, or appeal" any bylaws adopted, amended, or repealed by the BRI Board as provided in Article IX. Significantly, BRI's February 9, 2016, Form 8-K, signed by Counterdefendant Dan Anderson and filed with the SEC, disclosed only the Article III Bylaw amendments but intentionally failed to alert the shareholders and the public of the

1    substantial change to Article IX.

2        29.    On February 16, 2016, the BRI Board filed a Form 8-K, in which the BRI Board

3    purportedly approved the amendments to the BRI Bylaws on February 9, 2016.  The Bylaws

4    amendment (a) staggered the election of Directors so that they could not all be simultaneously

5    removed from office, and (b) removed the right of the shareholders to approve and ratify future

6    Bylaw amendments.  The Form 8-K did not mention the amendment of the Bylaws removing the

7    shareholders' right to approve future amendments.

8        30.    On February 17, 2016, Derivative Plaintiffs and Val Holms reached a settlement to

9    resolve the 2014 Derivative Action, which was intended to be presented to Judge Patrick

10    Flanagan, presiding Judge of the 2014 Derivative Action, for his approval pursuant to NRCP 23.1.

11    The terms of the settlement included, among other things: (1) Val Holms agreed to sell all of his

12    shares in BRI to Graiwer at a price of $0.16/share; (2) Val Holms agreed to modify the five

13    percent (5%) overriding royalty in the November 26, 2010, Asset Purchase Agreement to a

14    reduced ten percent (10%) of all monies received by BRI on oil and gas production from Val

15    Holms' property; (3) Val Holms agreed to resign from his position as CEO and Director of the

16    BRI Board and not take any future employment with BRI nor acquire any future stock in BRI; (4)

17    Val Holms granted BRI a one-year option to require Holms to purchase the Duck Lake minerals at

18    the same net price which BRI paid; (5) Holms agreed to pay Graiwer $479,426.35 for attorneys'

19    fees incurred in the 2014 Derivative Action on behalf of Plaintiffs; and (6) Graiwer and Holms

20    each fully released each other of all liability.

21        31.    The terms of the settlement were disclosed to all parties on February 29, 2016,

22    through a filing made by Val Holms.  The parties' counsel were also notified of the settlement via

23    email.

24        32.    On May 9, 2016, Val Holms filed with the Court the executed settlement agreement

25    between Graiwer and Val Holms (the "Derivative Settlement Agreement") for approval pursuant

26    to NRCP 23.1.

27        33.    Val Holms filed a Motion to Confirm Settlement in the 2014 Derivative Action on

28    May 9, 2016.  Derivative Plaintiffs joined the Motion on June 9, 2016.  On June 10, 2016, both

8

1 │ BRI and BRI General Counsel (also a defendant in the 2014 Derivative Action) Paul opposed the

2 │ Motion, presenting the argument that the proposed settlement violated, among other things, insider

3 │ trading laws.

4 │    34.    After receiving notice of the terms of the proposed settlement, Paul, acting as

5 │ General Counsel for BRI and the BRI Board, engaged in additional intentional acts to thwart the

6 │ settlement and to protect his own financial interests above the best interests of BRI shareholders.

7 │    35.    The same day that the Motion to Confirm Settlement was filed, Paul instructed the

8 │ BRI Board to file a Form 8-K, disclosing for the first time that BRI had entered into a "term sheet

9 │ with Eagle Private Equity ("Eagle"), a New York-based private equity firm, for debt and equity

10 │ financing" (the "Term Sheet"). The Term Sheet provided for an immediate one-million-dollar

11 │ credit line to be provided by Eagle, along with a subsequent debt or equity financing of up to ten

12 │ million dollars. Proceeds from the loans and other financing was reported to be intended for the

13 │ "acquisition of mineral assets".

14 │    36.    The next day, on May 10, 2016, Paul instructed the BRI Board to file another Form

15 │ 8-K, which provided that BRI had now executed a loan agreement with Eagle with general terms

16 │ including: (1) that BRI paid a 5% fee ($50,000) for the right to draw on the $1 million credit

17 │ facility; (2) that Eagle has the right to force "the Company [to borrow] up to the balance of the

18 │ Facility" if the company has not drawn on the Facility; and (3) in the event there is a "change[] in

19 │ control of the Company, loans under the Facility are convertible into shares of a newly-designated

20 │ class of the Company's Series A Preferred stock," with each preferred share being convertible into

21 │ 100 shares of common stock at Eagle's option.

22 │    37.    The Eagle Convertible Loan Credit Agreement ("Facility"), and exhibits thereto,

23 │ included a provision for a "Triggering Event," which granted Eagle the right to convert the

24 │ outstanding loan into shares of BRI Preferred Stock. The option price was $1 per share.

25 │    38.    The sole purpose of the Facility was to secure a mechanism whereby Eagle could

26 │ convert its "loan" to BRI Preferred Stock in order to gain a majority voting control of the

27 │ corporation, to thwart any attempt by Graiwer to seize control of BRI and remove Paul as General

28 │ Counsel and replace the BRI Board by shareholder vote in accordance with the BRI Bylaws.

Robison, Sharp,
Sullivan & Brust
71 Washington St.
Reno, NV 89503
(775) 329-3151

9

39.    Indeed, Counterdefendant Paul explained in his Opposition to Plaintiffs' Motion for

Continuance, filed on May 13, 2016, that:

> [u]nder the terms [of the Eagle Facility] agreed to[,] if there is a
> change of control in the company (BRI), Eagle Private Equity has
> the right to convert its outstanding loans into shares of Series A
> preferred stock in BRI. Each share of Series A preferred stock has
> the voting rights of 100 shares of BRI common stock. As a result,
> Val Holms shares, on a fully diluted basis, would amount to
> twenty-one percent (21%) ownership in BRI, which is not
> controlling or a majority.

40.    The Triggering Events include:

> any transaction or series of related transactions whereby following
> such transactions, a majority of the members of the Company's
> Board of Directors existing prior to such transactions are either
> replaced or no longer constitute a majority of the Company's
> Board of Directors.

41.    At the time the Facility was executed, BRI was not in need of unconventional

financing. BRI's Form 10-Q for first quarter 2016 revealed that BRI had $5.826 million in current

assets and over $6.631 in total assets, with little to no debt.

42.    On March 21, 2017, the BRI Board convened a meeting to discuss the tax and

accounting ramifications of the Eagle transactions. During the meeting, the BRI auditor and tax

preparer informed the Board that, among other things: (a) the Eagle transaction was dubious at

best and would likely be invalidated by a court, and (b) no proof had been presented to the

auditors which would confirm that the alleged $600,000 loaned to BRI by Eagle had actually been

received by BRI or by Paul.

43.    On March 24, 2017, Ira Kwaller, a Certified Public Accountant that had been

consulted to address tax and accounting issues raised by the Eagle transaction, sent an email to

BRI Chief Financial Officer explaining that:

> As I understand it, **there never really was a loan** – or if there was, it was
> for a nano-second. **For all practical purposes, Eagle used the
> triggering event to force issuance of the preferred stock**. The notion of
> the preferred stock being originated as a consequence of the exercise of an
> embedded option is really a fiction." (Emphasis added).

44.    On January 4, 2018, Paul instructed the BRI Board on the advisability of a second

transaction with Eagle. In an email, Paul advised the BRI Board that his law firm held "an

1    aggregate of $250,000 in escrow ($150,000 by Eagle and $100,000 by PLG)" to facilitate a second

2    Facility.  BRI is informed and believes that this was a false representation by Paul, delivered for

3    the purpose of convincing the BRI Board to agree to a second Facility with Eagle.

4         45.    On January 9, 2018, based on Paul's advice and instruction, the BRI Board filed

5    another Form 8-K in which it disclosed a second loan agreement with Eagle, effective as of

6    December 29, 2017 ("2nd Facility").  BRI disclosed that, among other things, "The [2nd] Facility

7    is initially unsecured, but subject to certain triggering events generally described as changes in

8    control or attempted changes of control of the Company, including those events described in the

9    Company's Current Report on Form 8-K filed July 26, 2016, which describe an attempted hostile

10   takeover of the Company. . . . Similar to the Original Transaction, Loans under the Facility are

11   convertible into shares of a newly-designated class of the Company's Series B Preferred stock,

12   described below under Item 5.03 of this Report."

13        46.    Item 5.03 of the Report explained that a new series of preferred stock was being

14   created, entailing "one million (1,000,000) shares designated 'Series B Preferred.'"  The filing

15   further explains that:

16             In addition, in lieu of converting loans into shares of the Company's
               Series B Preferred Stock, Eagle may elect to take a first priority security
17             interest in the Company's assets. In addition, upon a triggering event, the
               Facility permits Eagle to put loans to the Company up to the balance of the
18             Facility.

19        47.    However, also in the report is the disclosure that, "Eagle granted to the Company

20   an option to allow the Company to redeem 600,000 shares of the Company's Series A Preferred

21   Stock that were held by Eagle.  The Company purchased this option for a fee of $50,000 and

22   redemption of the Series A Preferred was exercised at a 10% premium to the original acquisition

23   price of $600,000."

24        48.    This disclosure means that the Company, which paid Eagle $50,000 to acquire the

25   original Facility, purchased the option to acquire all of Eagle's Series A stock for $50,000 and a

26   10% premium.  This suggested that the former BRI Board controls all of Eagle's Series A stock.

27        49.    The Series B stock purports gives the holder preference in the event of

28   "Liquidation," which includes the right to pro rata division of the corporation's assets in the event

1    that insufficient assets exist to pay the holders "all accumulated but unpaid dividends on such

2    shares for each share of Series B Preferred."

3        50.    A Liquidation event includes, "(iv) any change of control of the Board, the

4    Corporation's voting stock". Further, whenever there is a liquidation event, the Board gets to

5    determine the value of the property being distributed to the Series B holders: "the value of such

6    distribution shall be the fair market value of such securities or other property as determined in

7    good faith by the Board."

8        51.    The voting rights of each share of Series B stock can be converted to 100 shares of

9    common stock.

10       52.    Then, on April 6, 2018, Paul instructed the BRI Board to file a Form 8K in which it

11   disclosed that:

12              On April 2, 2018, the Bakken Resources, Inc. (the "Company") received
                notice from Eagle Private Equity, LLC ("Eagle"), that Eagle believed the
13              Company made certain misrepresentations in connection with the
                transactions described in the Current Report on Form 8-K filed with the
14              SEC on January 9, 2018, and that Eagle now seeks to rescind such
                transactions. The Company disputes that any misrepresentations occurred.
15              The Audit Committee of the Company is currently investigating this
                matter.
16

17       53.    Paul invoiced BRI hundreds of thousands of dollars in fees that were incurred in

18   crafting, planning, and enacting his multiple Eagle schemes. BRI paid the invoices in full, and

19   Paul received personal benefit from the payments.

20       54.    Not only were the Eagle transactions dubious and unnecessary, but Paul breached

21   his fiduciary duty of loyalty to the BRI stockholders by failing to properly disclose that he knew

22   Eagle was not a legitimate "private-equity firm," and that it was established by Paul's client and

23   business associate for the sole and only purpose of wresting control of BRI from its stockholders.

24       55.    Upon information and belief, Paul drafted the Eagle Agreements for both BRI and

25   Eagle, and he represented both parties in the transaction. At no time did Paul appropriately

26   disclose to the BRI Board the fact that he represented both sides of the Eagle transaction.

27       56.    The BRI Board ignored their fiduciary duties in failing to properly vet Eagle and its

28   principal prior to voting to approve the Eagle schemes.

1    57.    Eagle was initially formed in Nevada on March 3, 2016, but then formed in New

2    York on April 22, 2016, a few weeks before the disclosure of the Eagle Term Sheet. Eagle's

3    organizer and principal, Carl George ("George"), is a long-time client and business associate of

4    BRI counsel Paul.

5    58.    George was Paul's client at the time of the Eagle transactions. George is a known

6    confidence man and fraudster.

7    59.    For example, in early May 2016, BRI issued a press release stating, in relevant part,

8    (1) that BRI had contracted with Eagle for debt and equity financing; (2) that George was the

9    principal of Eagle; and (3) that, "for roughly twenty years, Eagle has positioned its principals as

10    founders of, and itself a significant equity partner to, emerging companies in Eagle's investment

11    portfolio."

12    60.    Eagle was not organized in New York until April 4, 2016. Eagle was formed

13    exclusively to engage in the financing transaction with Paul and BRI, and Eagle had no experience

14    in "equity partnerships" as was disclosed to the BRI Board and BRI shareholders.

15    61.    During the course of the Eagle negotiation and attempted consummation, Paul

16    represented George's company "Champions League" in litigation in New York. Paul was the

17    registered agent for George's Champions League and at least five of George's other companies.

18    62.    The relationship between George and Paul has since deteriorated to the point that

19    George has accused Paul of abandoning him in a case in the US District Court, District of New

20    York, wherein George complains that Paul "was also paid several million dollars through Bakken

21    Resources, a company that we are the majority owners of. It is that matter that we are averse [sic]

22    to Wes Paul in for $20 million dollars."

23    63.    Further, a simple investigation of George reveals that he has little or no experience

24    as "a significant equity partner to emerging companies." To the contrary, George is a fraudster

25    and confidence man; Paul, as George's legal counsel and business associate, was expressly aware

26    of George's long history of immoral, dubious, and fraudulent business activities which includes,

27    but is not limited to:

28        a.    In 1999, George was sued in Minnesota for defaulting on an office
       equipment lease by not making monthly payments. Judgement in

1

the amount of $14,929 was entered against George.

2

b.    Also in 1999, George was sued by Founders Mezzanine Investors of Dallas, TX for investment fraud. Judgment in the amount of $315,149 was entered against George. In addition to being sanctioned several times, the Minnesota court found George to be in civil contempt twice and sentenced him to 30 days incarceration if he did not purge himself of contempt. The Court subsequently declared that George had purposely hidden his assets during the proceedings to avoid paying his creditors, which included hiding hundreds of thousands of dollars in a trust account in the Cooks Islands off the coast of New Zealand during the Court proceedings. When his bank accounts were garnished, the debt was only partially paid.   In November 2006, seven years after the original judgment, the creditors took a payment of $25,000 to partially satisfy the judgment.

3

4

5

6

7

8

9

c.    In 2000, George was sued by the City of Minot, North Dakota for failure to repay a loan. In August 2000, a judgement of $1,686,035 was entered against George. When the City of Minot attempted to collect its judgment against George, George falsely advised the Sheriff's Deputy that he had paid the judgment. Later, his home was levied for an execution sale to satisfy the City of Mint's judgment.

10

11

12

13

d.    In 2000, George voluntarily filed for Chapter 11 bankruptcy after the judgments for Founders Mezzanine Investors and City of Minot were entered against him.  The U.S. Trustee filed a motion to dismiss the case or to convert it to Chapter 7 because George was unemployed, had no income, was not operating a business that could be rehabilitated, and had filed for bankruptcy in bad faith to delay and/or avoid paying the judgments against him while he continued to sell the assets of his estate. George refused to convert to Chapter 7 and the Court ordered the case dismissed in April 2001. Accordingly, no debts were discharged.

14

15

16

17

18

19

e.    In 2008, George and his LLC, Capital Growth Partners, were sued in Minnesota by the former President of George's company for selling $2,500,000 worth of stock and embezzling the monies.

20

21

f.    In June 2008, George's wife filed for divorce in Minnesota. George was held in contempt, and to this day, refuses to pay well over $400,000 that he owes his ex-wife.

22

23

g.    In August 2009, George was sued in Minnesota by a collection agency for failing to pay an outstanding credit card balance since November 2006.  Judgment was entered against George in the amount of $11,917.77 in September 2009.

24

25

h.    In August 2010, George was evicted for failure to pay rent.

26

i.    In January 2011, George was sued in federal court for several counts of fraud and violating federal law by lying about hundreds of millions of dollars of funding George claimed his company had and was in the process of receiving. An outstanding judgment is still owed by George to the plaintiff.

27

28

Robison, Sharp,
Sullivan & Brust
71 Washington St.
Reno, NV 89503
(775) 329-3151

14

1

2
     j.    In July 2012, George was sued in Minnesota by his divorce attorney for non-payment of services. The attorney was awarded $9,645.

3

4

5

6

7

8
     k.    In 2014, George was sued for hacking into a private company's protected server, stealing the company's customer data, leaving a virtual time bomb to disable the computer, and demanding $60,000 to remove the malware. Mr. George threatened that unless the company met his demands, he would publish the volumes of stolen confidential customer information, including invoices and billing information. The Federal judge involved in the matter told George to stop hacking, disable the time bomb, and not to release customer data. George then violated the Court's Order and later told the Judge he was sorry but that, "anger got a little bit better of me." A preliminary injunction was then entered against George.

9

10

11
     l.    In June 2014, George was sued in Minnesota for Fraud, Misrepresentation, Breach of Fiduciary Duty, and selling unregistered securities in violation of the Minnesota Securities Act. The Court entered judgment against George.

12

13
     m.    In January 2015, a Confession of Judgement was submitted in Minnesota showing that George owes a debt of $11,130.45 to creditors Peter Goshgarian and 500 Lake Associates LLC.

14

15
     64.    There was never a legitimate business purpose to the Eagle transactions. The line of credit could have been -- as is typically done in a financing agreement -- secured by BRI's assets – namely the McKenzie County, North Dakota minerals that Val Holms himself contributed to the company. Yet, as Paul admitted, the Facility was secured by a "poison pill" designed solely to dilute the value and voting power of Val Holms' 47% of BRI stock and thwart the Derivative Settlement Agreement.

16

17

18

19

20
     65.    The Eagle transactions were a sham. BRI had no legitimate business reason to borrow funds from a third-party lender. BRI's Form 10-K (Annual Report) for the fiscal year ended December 31, 2015 (the "2015 Annual Report") disclosed that BRI had, as of December 31, 2015, total assets of over $6.6 million, current assets of $5.6 million, and cash and investments of $4,234,729.

21

22

23

24

25
     66.    The 2015 Annual Report provided: "The 2014 sale of the Greenfield mineral rights contributed significant cash reserves. These cash reserves are necessary to fund our defense against frivolous lawsuits and to ensure adequate funds exist to indemnify directors and officers as required by Company bylaws. Given our recent rate of use of cash in our operations we believe

26

27

28

1   we have sufficient capital to carry on operations for the next year. Our long term capital

2   requirements and the adequacy of our available funds will depend on many factors, including the

3   reporting company costs, public relations fees, and operating expenses, among others."

4        67.    In addition to the fact that BRI had no reason to borrow monies, BRI certainly had

5   no reason to structure a transaction that would result in a transfer of control of the Corporation in

6   exchange for a loan of $600,000.

7        68.    The $600,000 loan which Paul promoted and the BRI Board approved was not, on

8   information and belief, ever properly funded such that BRI actually had access to the loan facility

9   proceeds.

10       69.    Paul counseled the BRI Board that George was a bona fide businessman, and his

11  newly founded company Eagle Private Equity was a legitimate entity which maintained the

12  solvency and expertise that Paul represented to the BRI Board, which Paul knew to be false.

13       70.    The only purpose of the Eagle transactions was to enrich Paul while wrongfully

14  diluting the BRI stockholders' voting rights, and thwarting any attempt by the shareholders to vote

15  to replace the BRI Board, Paul as General Counsel, and other BRI managers.

16       71.    In the midst of the above-described activities, BRI stockholders became

17  increasingly concerned by the mismanagement and misconduct of Paul as BRI General Counsel.

18       72.    As a direct result of Paul and the BRI Board's Eagle transaction scheme, the share

19  price of BRI declined, thereby reducing BRI's market capitalization, causing substantial harm to

20  the BRI stockholders.

21      **B.**    **Paul and Feltman Ewing Concocted a Meritless Litigation Scheme in Montana**

22                 **and Nevada to Interfere With Val Holms' Effort to Transfer His Shares to Allen Holms in Order to Maintain Their Significant Personal Benefit From**

23                 **Effectively Controlling BRI as Its Counsel.**

24       73.    On July 29, 2016, Paul and Counterdefendant Feltman, through its principal Robert

25  F. Greer, instructed BRI's Montana counsel to file a First Amended Complaint and Application

26  for Temporary Restraining Order and Injunctive Relief in the Montana First Judicial District

27  Court, Cause No. CDV 2016-612, seeking damages and injunctive relief against Allan Holms and

28  Defendant Manuel Graiwer. The Montana Action arose from the same core set of facts that BRI

1    brought in this action, which have since been dismissed. Indeed, the thrust of both actions are

2    nearly identical. For example, in the Montana Action First Amended Complaint, Paul and Greer

3    instructed BRI's Montana counsel to allege that:

4          • Allan[1] entered BRI's Helena, Montana office unannounced and advised
5            those present of his intent to "take-over" the Company (¶11);

6          • Allan's support for the attempted takeover was the proxies he had acquired
             from the other BRI shareholders (¶12);

7          • Allan attempted to take control of the BRI Wells Fargo Bank account in
8            Helena, Montana (¶18); and

9          • The proxies that Allan offered in support of his takeover were given in
             violation of the Securities Exchange Act (¶21).

10         These allegations mirror several of the allegations raised in the Verified Complaint and

11   then the Ex Parte Application for TRO filed in this action on February 21, 2017 ("TRO

12   Application"), including:

13         • "On or around July 7, 2016, Allan purportedly received proxies from Val
14           for Val's [sic] Twenty-Six Million Two Hundred Thirty-Five Thousand
             (26,235,000) shares of the Company's common stock. Such proxies allowed
15           Allan to vote Val's shares in the Company (Verified Complaint, ¶18);

16         • Holms "charged into the Company office in Helena, Montana in an attempt
             to gain control of the Company" . . . [and] "also attempted to gain control of
17           the Company's bank accounts at Wells Fargo, located in Helena, Montana."
             (Verified Complaint, ¶21);

18         • "Allan has made attempts to create the false impression that he is in control
19           of the Company" (TRO Application, p. 5:10-11).

20         Further, the relief requested in the Montana Action mirrored the relief sought in the instant

21   action. For example, in the Montana Action, BRI:

22         requests a temporary restraining order prohibiting Defendant Val Holms
           from any of the following actions: providing a proxy to any person or
23         entity to vote his shares of Common Stock in BRI; representing to any
           person or entity that they are Directors of BRI with authority to conduct
24         business or take actions on behalf of BRI; attempting to act on behalf of
           BRI in any manner whatsoever; taking any actions that could affect the
25         business/operations of BRI in any respect; and exercising any of the
           proxies.
26
27   Montana Action First Amended Complaint, ¶¶50-51.

28   [1] In many instances, Allan Holms was referred to simply as "Allan" in order to avoid confusion in
     the reference to his brother Val Holms.

Robison, Sharp,
Sullivan & Brust
71 Washington St.
Reno, NV 89503
(775) 329-3151                                          17

74.     In instant action, BRI sought similar relief, asking this Court to "immediately restrain[] Allan Holms, or any person or entity purporting to be working with or affiliated with Allan from transferring or attempting to transfer any shares evidenced by BRI;" and "from filing or attempting to file any additional documents with the SEC that purport, indicate or in any way claim that Allan Holms is either an officer, director, or ten percent (10%) shareholder of BRI."

75.     Allan Holms sought, and obtained, a Temporary Restraining Order against BRI in the Montana Action, enjoining BRI from attempting to hold its annual meeting until 60 days after the Court had decided whether (a) Holms' election to the Board of Directors was valid and enforceable, and (b) whether BRI's equity transaction with Eagle, as set forth in ¶¶6-17 of the Verified Complaint, was fraudulent.

76.     On January 3, 2017, the Montana Court granted Allan Holms' application for Preliminary Injunction and set a hearing to occur on February 28, 2017, to decide whether his proxy solicitations were valid, whether he was properly appointed to the Board of Directors, and whether the Eagle transaction, concocted by Paul and approved by the BRI Board, was a sham.

77.     In July 2016, in response to the Montana Action, Val Holms and Allan Holms consulted with John Doubek, an attorney with the firm of Doubek, Pyfer & Fox PC, in Helena Montana, regarding their desire to retain Mr. Doubek to represent them in the Montana Action.

78.     During that initial retention discussion, Val Holms told Doubek that he desired to transfer half of his BRI shares to his brother, Allan Holms, because Val Holms was running out of money to fund the litigation and Allan Holms was willing to contribute toward the costs of the Montana Action. Val and Allan Holms executed the retention agreement in Doubek's office reflecting this intent on August 1, 2016.

79.     Although the parties executed the Doubek retainer agreement, nothing more formal was executed at the time to transfer one-half of the BRI shares.

80.     Then, in October 2016, Val Holms told Doubek that he had become aware that a more formal agreement was necessary to effectuate the desired stock transfer to Allan Holms.

81.     Val Holms told Doubek in October 2016 that in addition to the shares he had already agreed to transfer to Allan, he now desired to transfer all of his remaining BRI shares to

1    Allan Holms.

2        82.    Val Holms explained to Doubek several reasons why Val Holms desired to transfer

3    his BRI shares to Allan Holms.  Doubek asked Val Holms if he needed attorney assistance in

4    facilitating the transfer, and Val Holms told Doubek that he had a form agreement and could

5    manage the transfer himself.

6        83.    On December 6, 2016, Val Holms instructed his assistant Susan Fortner to email

7    Allan Holms copies of his BRI stock certificates in anticipation of the anticipated meeting in

8    Montana to formalize the transfer.

9        84.    On or about December 10, 2016, Allan Holms and Val Holms met in Polson,

10    Montana, for the purpose of executing the documents they both believed to be necessary to

11    effectuate Val Holms' intent to transfer all his BRI shares to Allan.

12        85.    Val Holms presented Allan with a draft "Assignment Agreement," which Val

13    indicated was sufficient to memorialize his intent to transfer all of his shares to Allan Holms.

14    Both Allan Holms and Val Holms executed the Stock Assignment Agreement on or about

15    December 10, 2016, in Polson, Montana.

16        86.    Mari Holms, Val's wife, witnessed Val Holms execute the Stock Assignment

17    Agreement.

18        87.    During the same meeting between the brothers in December 2016, Val Holms

19    presented Allan with a number of copies of the BRI share certificates, which had been endorsed to

20    Allan Holms.  Val Holms also presented Allan Holms with copies of "Irrevocable Stock/Power

21    Form" for the shares.

22        88.    Mari Holms witnessed Val Holms execute the stock powers that were given to

23    Allan Holms, and she has verified, under oath, that it is Val's signature on the documents, and has

24    executed an affidavit to that effect.

25        89.    Within a few days of December 10, 2016, Val Holms called Doubek and explained

26    that he had executed an "Assignment Agreement" transferring all of his shares to Allan Holms.

27    Val explained to Doubek that he was proud of himself for having accomplished this process

28    without the need of legal assistance.

Robison, Sharp,
Sullivan & Brust
71 Washington St.
Reno, NV 89503
(775) 329-3151

19

90. During that call, Val Holms told Doubek that he did not have the original share certificates and that he believed they were being held by BRI management. Val Holms told Doubek that he had copies of all the share certificates and that he was going to endorse them and deliver them to Allan Holms, along with the executed Assignment Agreement.

91. During that call, Val Holms indicated to Doubek that he believed he had done all that was necessary to effectuate the transfer of all his BRI stock to Allan Holms. Doubek has declared that there is "no doubt in my mind but that Val Holms thought he had fully accomplished the assignment of all of his said shares of common stock to his brother, Allan Holms."

92. Val Holms died on December 24, 2016.

93. In January 2017, Allan Holms contacted Nevada Agency & Transfer Company ("NATCO") for the sole purpose of completing the transfer of the BRI stock certificates that he had acquired from Val Holms.

94. Allan provided a number of documents to NATCO in furtherance of his efforts to satisfy NATCO that he was the proper owner of the shares and that he was entitled to the transfer he requested.

95. On February 16, 2017, during a BRI Board meeting, Paul informed the BRI Board of Allan Holms' communication with NATCO. Paul advised the BRI Board that Allan Holms' actions were wrongful under Nevada securities law. Paul recommended to the BRI Board that it commence an action to seek a restraining order against Allan Holms, that it "communicate the attempt to Oliver Goe," who was BRI's attorney in Montana, and to "get this information before Judge Flanagan" who presided over the BRI Derivative Actions at the time.

96. Based on Paul and Greer's advice to the BRI Board, on February 21, 2017, BRI Counsel filed the Verified Complaint and Application for Temporary Restraining Order in this action. The Verified Complaint contained three claims for relief against Allan Holms: attorney's fees (presumably as an element of special damages); prayer for injunctive relief; and prayer for declaratory relief.[2] BRI sought declaratory judgment that the proxies Allan Holms had secured

[2] Nevada law does not recognize requests for injunctive and declaratory relief as "causes of action," but Allan will refer to them this way as that is how the requested remedies have been pled. See Cole v. CIT Grp./Consumer Fin., Inc., 126 Nev. 701, n.1, 367 P.3d 759 (2010).

1    were not legitimate, and, thus, that Allan Holms' efforts to represent himself as the majority

2    shareholder is wrongful.

3        97.    BRI counsel Paul and Greer conducted substantial discovery in 2018, attempting to

4    prove the allegation that Allan Holms had forged a medallion guarantee on the Val Holms Stock

5    Powers. Paul, Greer, and other BRI counsel attended a deposition in Spokane, Washington in

6    which the bank witness testified that the medallion guarantee was indeed genuine and not a

7    forgery as BRI had contended. BRI counsel Paul and Greer ignored the uncontroverted testimony

8    and continued to pursue the meritless claims against Allan Holms, at the BRI shareholder's

9    expense.

10        98.    On June 12, 2018, Allan Holms filed his Motion for Summary Judgment, seeking

11    an order dismissing each of BRI's claims against him in the instant action. Allan Holms

12    contended that BRI lacked standing to interfere with his private-party transaction with Val Holms

13    that resulted in Allan Holms owning Val Holms' BRI stock.

14        99.    BRI counsel, directed by Greer and Paul, first sought to continue the Motion,

15    pursuant to an invalid reading of NRCP 56(d). Then, BRI counsel opposed the Motion with

16    meritless argument and authority, contending that BRI maintained standing to protect itself against

17    violations of Federal and Nevada securities laws.

18        100.    On October 22, 2018, the Court granted Allan Holms' Motion for Summary

19    Judgment and enjoined BRI from entering further Eagle-like transactions. As to the merit of

20    BRI's claims, the Court found that:

21            "Although BRI has a statutory interest in ensuring proper succession of its
            share certificates, in this case, that role is ministerial only, and does not
22            give BRI standing to seek injunctive relief with regard to any dispute
            between Allan Holms or the Estate of Val Holms related to ownership of
23            BRI stock. Because BRI lacks standing to seek judicial relief related to
            any ownership dispute related to BRI stock, BRI will not be permitted to
24            be involved in any potential ownership dispute as proxy for the Estate of
            Val Holms. It should not be involved in the dispute between potential
25            claimants to this stock."

26        101.    The Court further ordered that

27            "until further order of this Court, BRI shall provide the parties with
            advance written notice of no less than seven (7) days if it wishes to take
28            action which: (a) amends BRI's Bylaws in a manner that alters the rights

of any equity securities of the Company; (b) alters any of the rights of, or issuing or reclassifying of, any equity securities of the Company; and/ or (c) involves entering into any financing agreements which may result in the alteration or modification of the equity securities of BRI. The advance written notice shall identify with reasonable particularity the action BRI contemplates taking."

102.    BRI never had standing to bring its claims in the current action. Paul and Greer, acting as BRI's counsel, knew or should have known that BRI's action against Allan Holms was utterly factually and legally meritless.

103.    Paul and Greer negligently advised and instructed the BRI Board to pursue the Montana Action and this action based on meritless legal theories which a reasonable attorney with the reasonable and customary skill and experience would have recognized and acknowledged as meritless.

104.    Paul and Greer did not advise and instruct the BRI Board to pursue the Montana Action for a genuine and legally supportable reason; rather, the advice and counsel was motivated solely to prevent Allan Holms from acquiring Val Holms' stock which would have given him authority to terminate Paul and Greer, and to replace the then-existing BRI Board.

105.    Paul and Greer's advice and counsel to the BRI Board to pursue the Montana Action and this action was negligent, and breached the duty of care owed to BRI, their client.

106.    Paul and Greer's advice and counsel to BRI to pursue the Montana Action and the instant action rendered no actual or perceived benefit to BRI or its stockholders.

107.    BRI paid Paul and Greer each a substantial fee for their work in prosecuting the Montana and instant action.

C.    **Brownstein, Lowenstein, and Alix Advised, Counseled, and Instructed the BRI Board to File a Meritless Chapter 11 Bankruptcy.**

108.    In the Summer of 2018, the BRI Board terminated BRI's then-current counsel. BRI engaged Lowenstein because of a personal relationship between Counterdefendant Charas and a Lowenstein attorney on or about August 9, 2018.

109.    The BRI Board recommended retaining Lowenstein to assist it with the "Allan Holms Problem," which referred to the fact that the BRI Board knew that when Allan Holms secured control of BRI, they would all be replaced, and their substantial stipends would cease.

1    110.    Lowenstein did not provide advice and counsel which was intended to be beneficial

2    to the BRI shareholders, to whom the BRI Board and Lowenstein owed their duties, but instead to

3    focus on the "Allan Holms Problem."

4    111.    Prior to the adjudication of Allan Holms' Motion for Summary Judgment,

5    Lowenstein instructed BRI Nevada counsel to open dialogue with counsel for the Estate of Val

6    Holms ("Estate") with the aim of reaching an agreement with the Estate that would prevent Allan

7    Holms from securing a judgment determining him to be the owner of Val Holms' 26,235,000

8    shares of BRI, representing approximately 47% of the outstanding BRI shares (the "Stock").

9    112.    Lowenstein's sole and only purpose for opening a settlement dialogue with the

10   Estate was to ensure that Allan Holms did not secure ownership of the Stock.  There was no

11   genuine or legitimate BRI business objective being sought through the effort to prevent Allan

12   Holms from owning the Stock.  Rather, BRI's sole objective in negotiating with the Estate was to

13   ensure that Allan Holms did not secure the Stock, which would have given him near-majority

14   control over BRI and would have enabled him to terminate BRI counsel and replace the Board.

15   113.    Simply put, the BRI Board and Lowenstein' primary objective in undertaking this

16   course of action was self-preservation, motivated out of the desire to continue to benefit

17   financially from their lucrative respective positions on the Board and as BRI counsel.

18   114.    The negotiations with the Estate were unsuccessful.  However, Lowenstein

19   received a substantial fee from BRI for its role in attempting to negotiate an agreement with the

20   Estate.

21   115.    On October 22, 2018, the Court granted Allan Holms' Motion for Summary

22   Judgment, determining that "BRI has not asserted a claim to ownership of the BRI stock," and

23   that, as to the Stock, "only two current possible ownership outcomes: 1) the Estate of Val Holms

24   owns the BRI shares because Val owned them when he died; or 2) Allan Holms owns the shares

25   because of an effective assignment during Val's life."

26   116.    Shortly after receipt of the Order granting summary judgment, Allan Holms and the

27   Estate reached an agreement whereby the Estate acknowledged Allan's claim to the Stock (the

28   "Estate Settlement").

1       117.   On November 1, 2018, Allan Holms filed a *Joint Notice of Intent to Enter Into*

2  *Settlement Agreement Between Allan Holms and the Estate of Allan Holms* ("Notice"), in which

3  Allan Holms and the Estate of Val Holms (the "Estate") indicated their intention to seek probate

4  court approval of the Estate Settlement wherein the Estate waived and relinquished any claim to

5  the Stock.

6       118.   BRI's Nevada counsel was served with a copy of the Notice.  Immediately upon

7  receipt of the Notice, the BRI Board and its counsel Lowenstein and Brownstein, scrambled to

8  convene emergency meetings, exchange urgent correspondence, and formulate strategies to

9  prevent consummation of the settlement between Allan Holms and the Estate.  The sole and only

10  function of the emergency meetings, urgent correspondence, and strategy sessions was to prevent

11  Allan Holms from acquiring the Stock.

12       119.   The BRI Board and its counsel Lowenstein and Brownstein immediately instructed

13  BRI's Montana counsel to file papers in the Val Holms probate action, pending in Lake County,

14  Montana, with the aim of persuading the probate court to refuse to approve the proposed Estate

15  Settlement.

16       120.   The BRI Board and its counsel Lowenstein and Brownstein considered numerous

17  other alternatives to prevent the consummation of the Estate Settlement.  One such alternative,

18  proposed by Lowenstein, was that BRI file bankruptcy in order to prevent the Nevada and

19  Montana courts from taking further action toward approving the Estate Settlement.

20       121.   Lowenstein convened a meeting with the BRI Board and recommended the Board

21  approve a Chapter 11 filing in the United States Bankruptcy Court, District of Nevada.

22  Lowenstein advised the Board that its attorneys would prepare and file the necessary paperwork

23  using the assistance of Brownstein, which had attorneys licensed to practice in Nevada.

24       122.   In furtherance of the plan to file a petition for Chapter 11 bankruptcy, BRI counsel

25  Lowenstein and Brownstein recommended to the BRI Board that BRI retain Alix to provide

26  "restructuring" services, in order to make the proposed bankruptcy appear legitimate.

27       123.   BRI counsel Lowenstein and Brownstein prevailed on the BRI Board to retain Alix

28  as consultants.  BRI counsel Lowenstein and Brownstein never disclosed to the Board the ultimate

1    intention to appoint Alix principals as officers and managers of BRI.

2        124.    Based on the recommendation of BRI counsel Lowenstein and Brownstein, the BRI

3    Board agreed to retain Alix as consultants to assist with "restructuring." Further, based on the

4    recommendation of Lowenstein and Brownstein, BRI paid an insurance premium associated with

5    Alix's "consulting" work in the amount of $139,000, which was intended solely to protect Alix

6    from what BRI counsel knew was an illegitimate bankruptcy strategy.

7        125.    Lowenstein and Brownstein filed the BRI Petition for Chapter 11 bankruptcy on

8    December 7, 2018.

9        126.    Accompanying the petition were fifty (50) additional filings comprised of various

10    meritless and non-sensical "first-day" motions and accompanying declarations which were

11    designed to give the appearance of a legitimate debtor-in-possession Chapter 11 filing.

12        127.    However, unlike a legitimate Chapter 11 petition, the BRI petition prepared by

13    Lowenstein and Brownstein did not include the required completed schedules and statements of

14    financial affairs; instead, BRI counsel sought leave of the court for additional time to file the

15    schedules and statements.

16        128.    Included amongst the several other meritless and unnecessary first-day motions

17    was a motion seeking court approval to "to object to certain transfers of Common Stock" between

18    its equity holders, and granting BRI the authority to render any such transfer *void ab initio*

19    pending a final and non-appealable order of the Bankruptcy Court." The Motion relied on an

20    erroneous reading of complicated tax laws but was nothing more than a thinly veiled effort to

21    obtain the court's approval to prevent Allan Holms from acquiring majority control of BRI and

22    removing the BRI Board.

23        129.    Also accompanying the petition were motions seeking orders of the bankruptcy

24    court to permit BRI to retain Lowenstein and Brownstein and approve payment of their fees.

25        130.    The petition also included motions seeking orders of the bankruptcy court to permit

26    BRI to retain AP Services, LLC, "an affiliate of AlixPartners, LLP." BRI counsel represented that

27    "APS, AlixPartners, its subsidiary affiliates, and its predecessor entities have provided

28    restructuring or crisis management services in numerous large cases."

Robison, Sharp,
Sullivan & Brust
71 Washington St.
Reno, NV 89503
(775) 329-3151

25

131.    Accompanying the petition was a Declaration of Richard Robbins, an Alix principal in which he consented, on behalf of BRI, to the Bankruptcy, and in which he affirmed his instruction to Lowenstein to file the same.

132.    Robbins executed a concurrent Declaration in support of BRI's "first-day" motions, filed on December 7, 2018, in which he stated that he was "formally appointed by the [BRI] Board of Directors (the "Board") to serve as the Company's V.P. of Restructuring on December 6, 2018."

133.    Robbins declared, "I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. The debtor requests relief in accordance with the chapter specified in this petition."

134.    In his Declaration, Robbins affirmed that "subsequent to the engagement of APS by the Company, I interviewed the Company's senior management and Board on multiple occasions, met with the Company's legal advisors, familiarized myself with the Company's books and records, and reviewed numerous documents maintained by the Company. **As such, I am familiar with the Company's business and financial affairs**. Together with the Board, I am responsible for, among other things, devising and implementing strategies for the Company, including: (a) assisting the Company with its financial and treasury functions; (b) working with the Company and its team to further identify and implement both shortterm and long-term liquidity generating initiatives; (c) developing a restructuring strategy and a revised business plan for the Company and such other related forecasts as may be required; (d) negotiating and implementing restructuring initiatives and evaluating strategic alternatives, including with respect to any potential sale of Company assets; (e) assisting in negotiations with stakeholders and their representatives; (f) assisting in negotiations with potential acquirers of Company assets; (g) providing assistance in such areas as preparation of a Chapter 11 filing under the United States Bankruptcy Code, coordinating and providing administrative support for the proceeding and developing the Company's plan of reorganization or other appropriate case resolution, if necessary; (h) assisting as requested in managing any litigation that may be brought against the Company in the Court; and (i) providing assistance in such areas as testimony before the

1  Bankruptcy Court on matters that are within the scope of my engagement and within my

2  testimonial competencies." (Emphasis added).

3      135.    Accompanying the first-day motions was a request of the bankruptcy court to

4  approve a proposed BRI interim budget during the pendency of the bankruptcy case.  That budget

5  proposed that the court approve an interim budget that included nearly **$250,000 per month for**

6  **Alix "consulting fees" and $200,000 for attorneys' fees for BRI's counsel Lowenstein and**

7  **Brownstein**.

8      136.    Notwithstanding the representations contained in the petition and first-day motions,

9  BRI counsel never filed a complete and accurate rendition of BRI's Statement of Financial Affairs

10  and bankruptcy schedules.

11      137.    Allan Holms and the Office of the United States Trustee objected to BRI's first-day

12  motions as being unnecessary, wasteful, and seeking relief to which BRI was not entitled.

13      138.    On January 18, 2019, Allan Holms filed his Motion to Dismiss, seeking an Order

14  dismissing the BRI bankruptcy.  Allan Holms contended that the bankruptcy was filed in bad faith

15  and there was no legitimate bankruptcy purpose necessitating the petition.

16      139.    On February 4, 2019, BRI counsel Lowenstein and Brownstein filed an Objection

17  to Allan Holms' Motion to Dismiss.  Accompanying the Opposition (filed on February 5, 2019)

18  was another Robbins Declaration filed in support of the Objection to the Motion to Dismiss.

19      140.    In his February 5, 2019, Declaration, Robbins declared that "Except as otherwise

20  indicated herein, the facts set forth in this Declaration are based upon my personal knowledge of

21  the Debtor's business operations, my review of relevant documents, information provided to me or

22  verified by other employees or the Debtor's professional advisors, including AP Services, LLC,

23  [Lowenstein], [Brownstein] and/or my opinion based upon my experience, and/or my personal

24  knowledge of the [BRI]'s financial records."

25      141.    BRI's counsel Lowenstein and Brownstein, in conjunction with Alix, asserted to

26  the bankruptcy court that bankruptcy protection was necessary to ensure BRI's continued

27  solvency, despite the fact that the filings accompanying the petition evidenced the fact that BRI

28  had over $5,000,000 in assets and only $1,000,000 in liabilities, including cash on hand to pay its

Robison, Sharp, Sullivan & Brust
71 Washington St.
Reno, NV 89503
(775) 329-3151

27

1   unsecured debts.

2        142.    On February 13, 2019, in response to the facts and arguments contained in Allan

3   Holms' Reply in support of his Motion to Dismiss, BRI counsel Lowenstein and Brownstein filed

4   a Notice of Limited Consent to Dismissal and Withdrawal of Declaration in Support of the

5   Objection to Motion to Dismiss ("Notice").

6        143.    In the Notice, BRI counsel conceded that the substance of the Robbins Declarations

7   declaring the bankruptcy necessary for BRI to remain solvent was false.

8        144.    BRI counsel conceded that "[a]fter filing the Objection and Declaration, [BRI]

9   became aware of facts and circumstances that render the above captioned bankruptcy matter

10  unnecessary and result in the [Robbins] Declaration being unsupportable by fact."

11       145.    Notwithstanding the concession that the facts contained in the Robbins declaration

12  supporting the bankruptcy were false, BRI counsel Lowenstein and Brownstein received

13  substantial fees from BRI, as did Alix.

14       146.    None of the first-day motions prepared and filed by BRI counsel Lowenstein and

15  Brownstein were necessary or appropriate.  In prosecuting the bankruptcy, Lowenstein,

16  Brownstein, and Alix spent hundreds of hours, incurring tens of thousands of dollars in fees paid

17  by BRI.

18       147.    For its services associated with the pre-petition work and the post-petition work,

19  Lowenstein received $831,573 in fees.

20       148.    For its services associated with the pre-petition work and the post-petition work,

21  Brownstein received $137,824 in fees.

22       149.    For its services associated with the pre-petition work and the post-petition work,

23  Alix received $493,343 in fees.

24       150.    After BRI conceded that the bankruptcy was illegitimate, Allan Holms and BRI

25  counsel Lowenstein and Brownstein, in conjunction with Alix, entered into discussions to dismiss

26  the bankruptcy and resolve Allan Holms' motion for sanctions against BRI for its bad faith

27  petition.

28       151.    The discussions resulted in a Stipulation for Dismissal of Bankruptcy Case

("Stipulation"), in which Allan Holms and BRI agreed, among other things, that:

      a.   The bankruptcy should be dismissed;

      b.   The BRI Board will "hold a vote to fill the vacancies of each standing director that elects to resign effective as of the entry of the Dismissal Order. The Board of Directors shall vote to fill each vacancy left by each resigning director. If all standing directors resign effective as of the entry of the Dismissal Order, then the Board of Directors will vote to fill one vacancy by appointing William Wood as interim director for Bakken. If less than all standing directors resign effective as of the entry of the Dismissal Order, then the Board of Directors will vote to fill each out-going vacancy with individuals selected and designated by William Wood."

      c.   "Bakken's out-going directors [BRI Board] and officers [Alix principals] and the interim director will cooperate with any transition work required to support these resignations including making registered agent changes and filing 8-K notices, as required, including the payment of the professional fees agreed to herein."

      d.   "Lowenstein Sandler, and AP Services, LLC shall cooperate timely and in good faith with the transition of Bakken's books and records at the reasonable request of Bakken's interim director."

152.   In addition to the covenants contained in the Stipulation, Allan Holms, BRI, the BRI Board, and the Estate entered into a Confidential Settlement and Release Agreement on or about March 12, 2019 ("BRI Settlement").

153.   The Stipulation and the BRI Settlement together consisted of the agreement between Allan Holms, BRI, and the BRI Board.

154.   The BRI Settlement contained, among other things, provisions permitting Holms to continue his pursuit of the BRI Board for breach of fiduciary duty as set forth in the pleadings in this action, and a provision purporting to release the BRI "professionals" from claims arising as a result of the bankruptcy case.

155.   The Stipulation, to the extent it was ever legally enforceable between Allan Holms and BRI, was breached by the BRI Board.

156.   The BRI Board failed to convene a vote to fill the Board vacancies resulting from the BRI Board resignations provided for in the Stipulation. As a result, William Wood was never appointed as an interim Director of BRI as contemplated by the Stipulation.

157.   BRI counsel confirmed in correspondence to Allan Holms' counsel that BRI's failure to deliver the required resolution appointing William Wood to the BRI Board constituted a

1    breach of the Stipulation.

2        158.    Further, because the BRI Board failed to nominate William Wood as the interim

3   Director, the BRI Board breached the provision of the Stipulation that required "Bakken's out-

4   going directors and officers and the interim director [to] cooperate with any transition work

5   required to support these resignations . . . ."

6        159.    Further, neither Lowenstein nor Alix have "cooperate[d] timely and in good faith

7   with the transition of Bakken's books and records at the reasonable request of Bakken's interim

8   director."

9        160.    Despite the newly constituted BRI Board of Directors' multiple and repeated

10   requests to the BRI Board, Alix, and Lowenstein for production of all the BRI books and records

11   in their possession, neither the BRI Board, nor Alix, nor Lowenstein has complied. The current

12   BRI Board of Directors lacks sufficient BRI financial records to complete BRI's tax returns,

13   audits, and/or financial reviews. The BRI Board, Alix, and Lowenstein possess documents and

14   records which belong to BRI and have refused to provide them, in contravention of the

15   Stipulation.

16        161.    The requirement of the Stipulation that the BRI Board nominate William Wood to

17   the Board of Directors prior to their resignation was a material inducement to enter into the

18   Stipulation; Allan Holms would not have entered into the Stipulation without the covenant

19   requiring the BRI Board to nominate William Wood to the Board of Directors.

20        162.    The requirement of the Stipulation that Alix and Lowenstein cooperate in good

21   faith with the new Board of Directors to transition the books and records was a material

22   inducement to enter into the Stipulation; Allan Holms would not have entered into the Stipulation

23   without the covenant requiring Alix and Lowenstein's good faith cooperation in providing the

24   books and records necessary for a transition to the new Board of Directors.

25        163.    The BRI Settlement as a stand-alone document is not enforceable. The BRI

26   Settlement lacks consideration, was *ultra vires*, and contained illusory promises. Even if the BRI

27   Settlement was enforceable when integrated into the Stipulation, it was breached when the BRI

28   Board, Alix, and the BRI professionals failed to perform the obligations contained in the

1   Stipulation.

2                          **FIRST CLAIM FOR RELIEF**
    (BRI's Claim for Breach of Fiduciary Duty against the BRI Board, Alix and
3                               A.P. Services LLC)

4        164.    BRI hereby refers to, alleges, and incorporates each and every allegation contained

5   in the preceding paragraphs as if fully set forth herein.

6        165.    Each and every member of the Counterdefendant BRI Board owes BRI fiduciary

7   duties of loyalty and care, and to carry out their duties in the best interest of BRI.

8        166.    David Hindman and Richard Robbins, both principals of Alix Partners and A.P.

_9   Services, and acting in their capacity as principals of Alix and A.P. Services, were officers of BRI.

10       167.    David Hindman and Richard Robbins, both principals of Alix Partners and A.P.

11  Services, and acting in their capacity as principals of Alix and A.P. Services, owed BRI fiduciary

12  duties of loyalty and care.

13       168.    Wesley Paul, as former BRI General Counsel, owed a fiduciary duty to BRI to act

14  in its best interests and to advise the Board of Directors with loyalty, honesty, and full disclosure

15  in a manner which is in keeping with ethical standards.

16       169.    Each and every member of the BRI Board breached their duties as set forth above,

17  including but not limited to its approval of the Eagle transactions, the retaining of Lowenstein and

18  Brownstein to pursue a course of action not calculated to benefit the BRI stockholders, and in

19  executing the BRI Settlement in their own self-interest without any benefit to the BRI

20  stockholders.

21       170.    Wesley Paul and Paul Law Group breached their duties to BRI as set forth above,

22  including but not limited to the concoction, promotion, counsel and advice related to the Eagle

23  transactions.

24       171.    David Hindman and Richard Robbins, both principals of Alix Partners and A.P.

25  Services, and acting in their capacity as principals of Alix and A.P. Services breached their duties

26  of loyalty and care owed to BRI as set forth above due to their participation and furtherance of an

27  illegitimate bankruptcy and "restructuring" plan which Alix knew to be meritless and not

28  calculated to benefit the BRI shareholders.

172. As a direct and proximate result of the BRI Board's breaches of their fiduciary duties, they have caused irreparable injury to BRI, and damages in an amount in excess of $10,000,000.00.

173. As a direct and proximate result of the Paul's breaches of his fiduciary duties to BRI, he has caused irreparable injury to BRI, and damages in an amount in excess of $10,000,000.00.

174. As a direct and proximate result of the David Hindman and Richard Robbins, both principals of Alix Partners and A.P. Services, and acting in their capacity as principals of Alix and A.P. Services' breaches of their fiduciary duties to BRI, has caused irreparable injury to BRI, and damages in an amount to be proven at trial.

175. The BRI Board, Wesley Paul, Paul Law Group, and David Hindman and Richard Robbins, acting in their capacity as principals of Alix and A.P. Services, did breach their duties with wanton, reckless, and fraudulent intent for which punitive damages are warranted.

## SECOND CLAIM FOR RELIEF
(Allan Holms Breach of Contract Against BRI Board)

176. Allan Holms hereby refers to, alleges, and incorporates each and every allegation contained in the preceding paragraphs as if fully set forth herein.

177. The Stipulation to the extent legally enforceable, constituted a contract pursuant to Nevada law.

178. The BRI Settlement was not enforceable as lacking consideration, ultra vires, and containing illusory promises. Even if the BRI Settlement was enforceable, it was integrated with the Stipulation to form the entire bargain between the parties.

179. Allan performed his obligations under the Stipulation and BRI Settlement or was excused from performance.

180. The BRI Board breached the Stipulation and BRI Settlement as set forth above.

181. The BRI Board's breach of the Stipulation and BRI Settlement released Allan Holms from performance of any obligation contained in the Stipulation and BRI Settlement.

182. As a direct and proximate cause of the BRI Board's breach of the Stipulation and

1    BRI Settlement, Allan Holms suffered harm well in excess of the jurisdictional minimum of

2    $15,000.

### THIRD CLAIM FOR RELIEF

3    (BRI Claim for Negligence Against Feltman, Alix, Brownstein, Lowenstein, A.P. Services,
     Wesley Paul and Paul Law Group)

4

5        183.    BRI hereby refers to, alleges, and incorporates each and every allegation contained

6    in the preceding paragraphs as if fully set forth herein.

7        184.    Counterdefendants Feltman, Brownstein, Lowenstein, Wesley Paul and Paul Law

8    Group, each maintained attorney-client relationships with BRI as set forth above.

9        185.    These Counterdefendants, and each of them, owed duties to BRI to use such skill,

10   prudence, and diligence as lawyers of ordinary skill and capacity possess in exercising and

11   performing tasks which they undertake on BRI's behalf.

12       186.    Alix and A.P. Services, LLC, owed BRI a duty of care to serve as BRI's

13   "restructuring" officers with such skill, prudence, and diligence as officers of ordinary skill and

14   capacity possess in exercising and performing tasks which they undertake on BRI's behalf.

15       187.    Counterdefendants Feltman, Brownstein, Lowenstein, Wesley Paul, Paul Law

16   Group, Alix, and A.P. Services LLC and each of them, breached their duties to BRI as set forth

17   above.

18       188.    Counterdefendants Feltman, Brownstein, Lowenstein, Wesley Paul, Paul Law

19   Group, Alix, and A.P. Services LLC, breaches were the proximate and legal cause of damages to

20   BRI.

21       189.    As a result of the Counterdefendants' negligence, BRI has suffered, and will

22   continue to suffer, actual loss and/or damages resulting from the breaches in an amount to be

23   proven at trial.

### FOURTH CLAIM FOR RELIEF

24   (Declaratory Relief)

25

26       190.    BRI and Allan Holms hereby refer to, allege, and incorporate each and every

27   allegation contained in the preceding paragraphs as if fully set forth herein.

28       191.    A controversy exists between Allan Holms, BRI, and Counterdefendants regarding

1    their respective rights and obligations under the Stipulation and BRI Settlement.

2    192. Allan Holms and BRI are entitled to declaratory relief finding that (a) the BRI

3    Settlement is not enforceable, (b) the BRI Board breached the Stipulation and BRI Settlement (to

4    the extent enforceable), and (c) Allan Holms is excused from performing any obligation contained

5    in the Stipulation and/or BRI Settlement.

6    **WHEREFORE,** Allan Holms and BRI pray as follows:

7    A.    For general and special damages according to proof;

8    B.    For declaratory judgment in favor of Allan Holms and BRI, and against the

9    Counterdefendants;

10    C.    For punitive damages according to proof;

11    D.    For attorneys' fees and costs of suit; and

12    E.    For such further relief as the Court deems just and proper.

13    **AFFIRMATION**
**Pursuant to NRS 239B.030**

14

15    The undersigned does hereby affirm that this document does not contain the social security

16    number of any person.

17    DATED this 18th day of February, 2020.

18    ROBISON, SHARP, SULLIVAN & BRUST
71 Washington Street
19    Reno, Nevada 89503

20    /s/Frank C. Gilmore
FRANK C. GILMORE, ESQ.
21    HANNAH E. WINSTON, ESQ.
Attorneys for Defendant/Counterclaimant ALLAN G.
22    HOLMS and BAKKEN RESOURCES, INC.

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5, I certify that I am an employee of Robison, Sharp, Sullivan & Brust, and that on this date I caused to be served a **ALLAN G HOLMS' AND BAKKEN RESOURCES, INC.'S SECOND AMENDED COUNTERCLAIM** on all parties to this action by the method(s) indicated below:

✓ by placing an original or true copy thereof in a sealed envelope, with sufficient postage affixed thereto, in the United States mail at Reno, Nevada, addressed to:

Bakken Resources, Inc.
1314 South Grand, Suite 2112
Spokane, WA 99201

Bill M. Baber
P.O. Box 430
Petrolia, TX 76377

Herman R. Landeis
4004 Carter Mountain Drive
Cody, WY 82414

Karen Midtlyng
225 Greenwood Drive
Helena, Montana 59601

Dan Anderson
3077 Early Bird Drive
Helena, Montana 59601

Douglas L. Williams
1970 Beltview Drive
Helena, Montana 59601

Solange Charas
333 East 75th Street, PhC
New York, NY 10021

___ by using the Court's CM/ECF Electronic Notification System addressed to:

___ by personal delivery/hand delivery addressed to:

DATED:  This 18th day of February, 2020.

Employee of Robison, Sharp, Sullivan & Brust